

# SUPREME COURT OF MISSOURI
## en banc

IN RE:  RYAN CHRISTOPHER  )        *Opinion issued July 22, 2025*
MCCARTY,                  )
                          )        No. SC100905
          Respondent.     )

## ORIGINAL DISCIPLINARY PROCEEDING

In this original attorney disciplinary proceeding, the Office of Chief Disciplinary Counsel ("OCDC") alleged Ryan Christopher McCarty disclosed confidential client information in violation of the Rules of Professional Conduct.  McCarty does not dispute he disclosed the information but contends his disclosures were required and warranted under these rules.  Additionally, McCarty claims his disclosures of confidential client information are protected by the First Amendment and Missouri's public-employee whistleblowing statute.

After an evidentiary hearing, a disciplinary hearing panel ("DHP") found McCarty violated the Rules of Professional Conduct and recommended he be reprimanded.  OCDC rejected the DHP's recommendation and recommended this Court suspend McCarty.  Following a *de novo* review of the record and consideration of the appropriate standards

for discipline and the mitigating and aggravating factors, this Court suspends McCarty's license to practice law indefinitely with no leave to apply for reinstatement for one year.

## Factual Background and Procedural History

McCarty was admitted to The Missouri Bar in 2010 and has no prior disciplinary history. In June 2022, he began working for the Kansas City Police Department ("KCPD") as associate general counsel. In this role, his client was KCPD. KCPD terminated McCarty fewer than six months later, on December 7, 2022.

KCPD's general counsel supervised McCarty. They immediately had a fraught relationship. McCarty believed the general counsel demeaned him, assigned him "grunt" work, treated him like a "glorified secretary," and created a hostile work environment for himself and others who worked in the general counsel's office. McCarty also believed he was "completely and unduly blackballed and ostracized from anything of importance" and "stonewalled from anything going on in [the office of general counsel], or the Department more generally." McCarty filed a hostile work environment complaint with KCPD in early October 2022; the complaint was closed the next month. Around this time, McCarty began e-mailing himself detailed notes about his work and interactions with KCPD employees and saving e-mails and documents related to his representation of KCPD that had been sent to his work e-mail address. He continued this practice until his termination.

During his employment, McCarty became concerned with a number of KCPD practices and procedures. On his first day, McCarty alleges he learned of a proposed policy to purge e-mails from KCPD's systems after six months. McCarty believed this policy, if

adopted, could result in widespread Sunshine Law and *Brady*/*Giglio* violations.[1] McCarty, however, did not know whether this policy was ever enacted and was not trained regarding KCPD's *Giglio* procedures.[2] He also believed he and the general counsel had "radically different views on *Giglio* issues" but the general counsel "effectively prevented [McCarty] from dealing with *Brady*/*Giglio* issues until November 29, 2022," approximately one week before his termination.[3]

He believed KCPD mishandled Sunshine Law requests, too. McCarty was not trained regarding Sunshine Law issues specific to KCPD and did not serve as KCPD's Sunshine Law coordinator. Near the end of his employment, McCarty tested his concerns about KCPD's Sunshine Law procedures by making his own Sunshine request. McCarty disputed the quoted monetary charge and time estimation for his request, both of which were subsequently reduced, then paid the amount and received the information requested.

When McCarty was terminated, his termination letter stated it was due to unsatisfactory performance during his probationary period. McCarty sent an e-mail to himself documenting his termination. He wrote, "I have all of the emails and associated records, and they will now be spread far and wide to reveal to the wider community just how bad things are at KCPD."

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963), requires prosecutors to produce potentially exculpatory evidence to persons charged with criminal offenses. *Giglio v. United States*, 405 U.S. 150 (1972), requires prosecutors to disclose any information that may be used to impeach a prosecution witness, including a law enforcement officer.

[2] Throughout his e-mail correspondence to himself, McCarty expressed he "kn[e]w NOTHING about most any of our active cases," the general counsel "likes to handle the *Giglio* matters herself," and he had "never been . . . briefed on any litigation case."

[3] McCarty appeared for KCPD at a court hearing involving a *Giglio* issue on that date.

McCarty acted promptly. The night he was terminated, he e-mailed two U.S. Department of Justice ("DOJ") investigators who were investigating KCPD based on allegations of discriminatory employment practices. McCarty was aware of the ongoing investigation because of his former position at KCPD. His e-mail to the DOJ investigators began: "Until this evening, I was the Associate General Counsel of the Kansas City, Missouri Police Department (KCPD). And until now, I was unable (owing to my ethical obligations as their attorney) to speak out." McCarty proceeded to name 10 individuals whom he claimed had recently filed internal complaints against the general counsel alleging discrimination, harassment, and a hostile work environment. He named four others "who have rightly complained of discriminatory conduct." McCarty directed the DOJ investigators to speak to all of these individuals. He also "strongly suggest[ed]" the investigators obtain via Sunshine Law request his e-mails documenting malfeasance at KCPD, or, because he kept copies of all these documents, McCarty was more than happy to provide them upon request. McCarty's e-mail asserted the DOJ investigators would find issues "broader than the scope of [their] investigation" and encouraged the investigators to contact him via e-mail or his personal cell phone number should they have any follow-up questions.

Three days after his termination and e-mail to the DOJ investigators, McCarty e-mailed 143 separate e-mail addresses an eight-page, self-described "letter to the world" detailing his numerous and varied concerns about KCPD. The e-mail also included 372 pages of attachments consisting of internal e-mails and memoranda from his time at KCPD. E-mail recipients included the governor, state legislators, the attorney general, prosecutors,

4

public defenders, sheriffs, private attorneys, members of the media, and other individuals McCarty deemed "stakeholders" of KCPD. The letter appeared on modified KCPD Office of General Counsel letterhead to which McCarty had access by virtue of his prior employment there. He modified his title on the letterhead to read "Former Associate General Counsel."

The contents of the letter criticized the interim chief of police, KCPD's general counsel, the city's Board of Police Commissioners, and the police department as a whole. McCarty condemned KCPD's handling of internal complaints and personnel matters and its approach to *Brady/Giglio* disclosures and Sunshine Law requests, and he called on the police board to seek the resignation of or to terminate certain individuals. McCarty's letter also previewed some of the documents contained in the 372-page attachment, which he gathered while employed at KCPD. As McCarty acknowledged in the letter, "most" of these internal documents pertained to McCarty's claims that his supervisor was creating a hostile work environment. The attached documents included internal e-mails with legal advice provided by the general counsel's office to KCPD about an array of topics and cases; detailed information regarding employees' disciplinary investigations and the discipline each individual employee received; and McCarty's detailed notes generated during his time at KCPD that he e-mailed to himself. Like his e-mail to the DOJ investigators, McCarty encouraged the recipients to make a Sunshine Law request of "ALL" of his e-mails. Prior to sending this e-mail, McCarty did not receive informed consent from KCPD to disclose this information. McCarty's "letter to the world" subsequently received media coverage in the Kansas City area.

5

In December 2023, OCDC filed an information alleging McCarty was guilty of professional misconduct for violating Rules 4-1.9(c)(1) and 4-1.9(c)(2). These rules state an attorney who formerly represented a client cannot thereafter reveal information relating to the representation or use information relating to the representation to the former client's disadvantage. In January 2024, McCarty filed his answer. McCarty admitted he e-mailed individuals at the DOJ; wrote the eight-page letter on a "variation of old KCPD Office of General Counsel letterhead"; and attached to his letter "emails and memos relating to his time as an employee of KCPD" but stated he limited the attachments to what he "in good faith believed encapsulated ongoing conduct of an illegal and/or unethical nature." McCarty asserted he acted as a whistleblower and believed his actions were allowed because they were in KCPD's best interests and his "ultimate clients were the citizens served by the KCPD."

Following a hearing, the DHP issued its decision finding McCarty disclosed documents to the public pertaining to his legal representation of his former client, thereby violating Rules 4-1.9(c)(1) and 4-1.9(c)(2). The DHP recommended he be reprimanded. OCDC rejected the DHP's recommendation and recommended this Court suspend McCarty's license to practice law indefinitely with no leave to apply for reinstatement for one year.

**Standard of Review**

"This Court has inherent authority to regulate the practice of law and administer attorney discipline." *In re Agron*, 701 S.W.3d 623, 628 (Mo. banc 2024) (internal quotations omitted). "Professional misconduct must be proven by a preponderance of the evidence before discipline will be imposed." *Id.* (internal quotations omitted). "This Court reviews the evidence *de novo*, independently determines all issues pertaining to credibility of witnesses and the weight of the evidence, and draws its own conclusions of law." *Id.* (internal quotations omitted). "This Court treats the DHP's findings of fact, conclusions of law, and recommendations as advisory and may reject any or all of the DHP's recommendations." *Id.* (alterations and internal quotations omitted).

**Analysis**

This Court finds McCarty violated both Rules 4-1.9(c)(1) and 4-1.9(c)(2). Rule 4-1.9 governs an attorney's duties to former clients and extends the duty of confidentiality enshrined in Rule 4-1.6. Accordingly, it is important to first understand an attorney's obligations under Rule 4-1.6. Rule 4-1.6(a) provides: "A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by Rule 4-1.6(b)." Rule 4-1.6(b) sets out limited circumstances in which a lawyer "may reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary." One of those circumstances is "to comply with other law or a court order." Rule 4-1.6(b)(4).

Foremost to the profession, a lawyer's duty to protect client information is "[a] fundamental principle in the client-lawyer relationship . . . ." Rule 4-1.6, cmt. 2. The duty of confidentiality is also much broader than the evidentiary rule of attorney-client privilege; this duty "not only applies to matters communicated in confidence by the client, but also to *all* information relating to the representation, whatever its source." Rule 4-1.6, cmt. 3 (emphasis added). But, like attorney-client privilege, the duty of confidentiality does not end when the attorney's representation of the client ends. As made clear by Rule 4-1.9, the rule directly at issue here, an attorney has continuing duties to former clients in terms of confidentiality. *See* Rule 4-1.9, cmt. 1. Rule 4-1.9(c) provides:

> A lawyer who has formerly represented a client in a matter . . . shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client or when the information has become generally known; or
>
> (2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

McCarty's status as a former government employee does not exempt him from this rule. Rule 4-1.11(a)(1) states: "Except as law may otherwise expressly permit, a lawyer who has formerly served as a public officer or employee of the government . . . is subject to Rule 4-1.9(c)."

McCarty violated Rules 4-1.9(c)(1) and 4-1.9(c)(2) when he revealed information related to his representation of his client, KCPD, and used that information to KCPD's disadvantage. McCarty testified during the DHP hearing that his client was KCPD, and he acknowledged his duty of confidentiality in his e-mail to the DOJ investigators, stating:

8

"until now, I was unable (owing to my ethical obligations as their attorney) to speak out." McCarty, however, failed to recognize his *continuing* ethical obligations to his former client under Rule 4-1.9. McCarty's briefing conceded "his December 2022 letter and omnibus exhibit included client-related information." For example, McCarty disclosed an e-mail documenting the legal advice he gave to KCPD regarding the disciplinary investigation of a police officer; in another e-mail, he disclosed he was asked to, and did, provide legal advice about the legal requirements for responding to a request for administrative investigation records. McCarty explicitly stated in his "letter to the world" that the attached documents were obtained by virtue of his position representing KCPD.

McCarty's e-mail to DOJ investigators and his subsequent letter also establish he used the information related to his representation of KCPD to KCPD's disadvantage. He explained he included these internal documents to support his allegations of "misbehavior and wrongdoing" at KCPD. While McCarty asserted his actions may ultimately be a net positive if the letter's recipients worked together to "resuscitate" KCPD, the immediate impact of his disclosures and disparaging commentary was to undermine the public's confidence in his former client and incriminate KCPD in the DOJ's investigation.

McCarty's "letter to the world" highlights the information he disseminated was not generally known either. In fact, the very purpose of that e-mail was to release information not generally known to individuals outside KCPD. He wrote: "I did this because I knew early on that at some point in the future, the public deserved to know what was going on at KCPD from the perspective of an insider at the highest level of the organization." Undoubtedly, McCarty disclosed this information without KCPD's informed consent or

9

implied authorization in order to carry out representation. Accordingly, this Court finds McCarty violated Rules 4-1.9(c)(1) and 4-1.9(c)(2).

## McCarty's Defenses

McCarty argues he was legally authorized to reveal information relating to his representation of KCPD. He asserts three justifications for his disclosures: (1) he was required to report unlawful conduct to his organizational client pursuant to Rule 4-1.13(b); (2) the disclosures were permissible under Rules 4-1.6(b)(4) and 4-1.9(c) because he was seeking to comply with other law; and (3) he is protected from discipline for speaking out about issues of public concern under the First Amendment and Missouri's public-employee whistleblowing statute.

### Required Reporting under Rule 4-1.13(b)

Rule 4-1.13 states:

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

(b) If a lawyer for an organization knows that an officer, employee, or other person associated with the organization is engaged in action, intends to act, or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law which reasonably might be imputed to the organization, and is likely to result in substantial injury to the organization, *the lawyer shall proceed as is reasonably necessary in the best interest of the organization*. In determining how to proceed, the lawyer shall give due consideration to the seriousness of the violation and its consequences, the scope and nature of the lawyer's representation, the responsibility in the organization and the apparent motivation of the person involved, the policies of the organization concerning such matters, and any other relevant considerations. *Any measures taken shall be designed to minimize disruption of the organization and the risk of revealing information relating to the representation to persons outside the organization.* Such measures may include among others:

10

(1) asking for reconsideration of the matter;

(2) advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

(3) referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act on behalf of the organization as determined by applicable law.

(Emphasis added).

McCarty asserts he did not make a "disclosure" but rather a "required report to the highest authority of his government client" pursuant to Rule 4-1.13(b). McCarty alleges, while he was associate general counsel at KCPD, he raised his concerns of serious misconduct with higher authorities within KCPD, including the general counsel, deputy chief, a captain, and the command staff. When his efforts failed and he was subsequently terminated, McCarty took his concerns to what he considered the "highest authority" for KCPD – its constituents, the citizens of Kansas City.

Rule 4-1.13(b) does not apply here. The rule pertains to lawyers who are employed or retained by an organization. The rule does not extend protections to lawyers who have been discharged. When McCarty disclosed confidential client information, he had already been terminated and was no longer employed or retained by KCPD. Accordingly, his conduct is not defensible under Rule 4-1.13(b).

Even if Rule 4-1.13 did extend to former lawyers, McCarty completely disregarded the rule's guidance for how a lawyer for the organization must proceed. The rule provides an attorney taking any measure under Rule 4-1.13(b) must "minimize disruption of the

11

organization and the risk of revealing information relating to the representation to persons outside the organization." Rather than minimizing disruption, McCarty sought disruption at KCPD by disclosing confidential client information to the public. He sent the e-mail to "all the decisionmakers and stakeholders," "as well as key members of the public and the free press," totaling more than 100 recipients. His letter denigrated the work of KCPD, called for the termination of multiple leaders within the organization, and damaged the reputation of an organization that relies on the trust of the citizens it serves.

Rule 4-1.13(b) suggests multiple measures a lawyer may take to minimize disruption and the risk of revealing client information, including, if warranted, "referral to the highest authority that can act on behalf of the organization as determined by applicable law." Rule 4-1.13(b)(3). Yet again, McCarty acted contrary to the rule. McCarty made his disclosures first to DOJ investigators, then to the public. The DOJ clearly is not a higher or the highest authority in the organization, and, despite McCarty's veiled arguments, "the public" is not a higher or the highest authority at KCPD as determined by applicable law because the public cannot act on behalf of the organization.[4] For these reasons, Rule 4-1.13 does not transform McCarty's unauthorized disclosures into a required report.

**Permitted Disclosures under Rules 4-1.6(b) and 4-1.9(c)(2)**

McCarty next claims his disclosures were permissible under Rules 4-1.6(b)(4) and 4-1.9(c)(2). Rule 4-1.6(b)(4) provides "[a] lawyer may reveal information relating to the

---

[4] The Kansas City Board of Police Commissioners has exclusive management and control of KCPD pursuant to section 84.460. All statutory references are to RSMo 2016 unless otherwise noted.

representation of a client to the extent the lawyer reasonably believes necessary . . . to comply with other law or a court order." "When disclosure of information relating to the representation appears to be required by other law, the lawyer *must* discuss the matter with the client to the extent required by Rule 4-1.4."[5] Rule 4-1.6, cmt. 10 (emphasis added).

Rule 4-1.9(c)(2) provides a lawyer who has formerly represented a client cannot thereafter "reveal information relating to the representation except as these Rules would permit or require with respect to a client." McCarty asserts he reasonably believed it was necessary to disclose client information without consent to "comply with other law" – specifically, Missouri's Sunshine Law and the Fourth, Sixth, and Fourteenth amendments.[6]

McCarty first argues he sent a "whistleblower email" providing notice to members of the public "about certain misconduct by the Kansas City Police Department, including

---

[5] Rule 4-1.4(a), which addresses communication in the client-lawyer relationship, states:
> A lawyer shall:
> (1) keep the client reasonably informed about the status of the matter;
> (2) promptly comply with reasonable requests for information; and
> (3) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows the client expects assistance not permitted by the Rules of Professional Conduct or other law.

[6] Rule 4-1.2 addresses the scope of an attorney's representation and provides further insights for navigating client wrongdoing. This rule suggests withdrawing from the representation, which would have been another appropriate course of action for McCarty. Rule 4-1.2, comment 9 states:
> When the client's course of action has already begun and is continuing, the lawyer's responsibility is especially delicate. The lawyer is not permitted to reveal the client's wrongdoing, except where permitted by Rule 4-1.6. However, the lawyer is required to avoid furthering the purpose, for example, by suggesting how it might be concealed. A lawyer may not continue assisting a client in conduct that the lawyer originally supposes is legally proper but then discovers is criminal or fraudulent. Withdrawal from the representation, therefore, may be required.

ongoing systemic Sunshine Act and *Brady*/*Giglio* violations." He asserts whistleblowing plays a critical role in a constitutional democracy by acting as a check on governmental power and promoting accountability, transparency, and integrity. While that may be, the functions of whistleblowing do not excuse an attorney's noncompliance with the Rules of Professional Conduct. Whistleblowing may have great value, but it is not one of the several enumerated exceptions to maintaining client confidentiality under Rule 4-1.6. In addition, the laws governing whistleblowing do not mandate or compel disclosure and, therefore, cannot be the basis to claim permissive disclosure under the exception articulated in Rule 4-1.6(b)(4) to "comply with other law."

Next, McCarty asserts his disclosures were permissible because the information was public and subject to disclosure under Missouri's Sunshine Law, codified in section 610.024. Like the laws governing whistleblowing, the Sunshine Law did not compel McCarty to disclose confidential client information. The Sunshine Law requires the state and its government entities to disclose non-exempt public information, but such disclosures must be made ***only if and when they are requested***. *See* section 610.023. Because no one requested McCarty or anyone else at KCPD disclose the information he shared with the DOJ investigators and more than 100 other individuals, his disclosures were not compelled – or even permitted – by the Sunshine Law.

To the extent McCarty argues the information he disclosed was not confidential because it was subject to the Sunshine Law, this argument similarly lacks merit. First, McCarty did not provide the DHP or this Court with any evidence that the information he disclosed was subject to the Sunshine Law. Second, and more importantly, this

14

information is confidential client information until a proper Sunshine Law request is received and a determination is made that the information is non-exempt and, therefore, subject to disclosure. *See* section 610.024. Until such a determination is made, this information remains confidential client information and protected by Rules 4-1.6 and 4-1.9.

Likewise, constitutional law – including the Fourth, Sixth, and Fourteenth amendments McCarty cited – did not compel his disclosures. McCarty is correct that the government, under the due process principles articulated in the Sixth and Fourteenth amendments, must disclose in a criminal prosecution exculpatory or potentially exonerating information and any information that may be used to impeach a prosecution witness pursuant to *Brady* and *Giglio*.[7] As a preliminary matter, only a fraction of the internal documents McCarty attached to his letter related to KCPD's disclosure practices. Even if this defense applied, it certainly does not excuse or justify the majority of McCarty's disclosures.

Moreover, McCarty was not prosecuting a criminal case. His disclosures of confidential client information were not made as part of a criminal prosecution, nor did his disclosures include exculpatory or potentially exonerating information or impeachment material related to a criminal offense or case. The United States Supreme Court's holdings

---

[7] McCarty makes no specific argument as to how the Fourth Amendment is implicated, but some of the attached documents included discussion of KCPD's search and seizure practices.

15

in *Brady* and *Giglio* simply do not apply to this situation. Therefore, McCarty was under no constitutional requirement to disclose confidential client information.

While McCarty may have believed KCPD was not properly releasing information and evidence subject to *Brady* and *Giglio* and he may have been motivated to release the information he disclosed to reveal what he perceived as improper policies and procedures, he most certainly was not compelled or required to do so under the holdings in *Brady* or *Giglio* or the United States Constitution. McCarty cannot shield himself from the Rules of Professional Conduct under the guise of promoting and pursuing the rights guaranteed to criminal defendants as enshrined in the constitution. As important as these rights may be, it does not compel him or any other lawyer representing a person or entity in a non-criminal prosecution to disclose confidential client information. This simply is not an exception to the sacrosanct rule prohibiting disclosure of information relating to the representation of a client under Rule 4-1.6.

**Protection under the First Amendment and Whistleblowing Statute**

McCarty claims the First Amendment and Missouri's public-employee whistleblowing statute prevent this Court from disciplining him for the disclosure of confidential client information. Because the First Amendment and Missouri's public-employee whistleblowing statute do not govern or prevent this Court from regulating the practice of law in this state or imposing attorney discipline, these arguments, like his other arguments, lack merit.

McCarty relies on *Pickering v. Board of Education of Township High School District 205, Will County, Illinois*, 391 U.S. 563 (1968), to assert his speech was protected

under the First Amendment because he was speaking as a citizen addressing matters of public concern. Generally, a public employee who speaks out as a citizen about a matter of public concern is protected under the First Amendment and insulated from employer discipline for that speech. *Id.* at 568. In *Pickering*, the Supreme Court held a public school teacher's First Amendment rights were violated when he was fired for sending a letter to a local newspaper criticizing the board of education and superintendent's handling of past proposals to raise revenue for local schools. *Id.* at 564. The Supreme Court noted the aim was to arrive "at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.

In *Garcetti v. Ceballos*, 547 U.S. 410 (2006), however, the Supreme Court imposed a limitation upon First Amendment protection for public employees' speech, holding, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421-22. Even if *Pickering* and its progeny applied to the facts of this case, in which a former government employee is being disciplined not by a former employer but by this Court's exercise of its inherent authority to enforce the Rules of

17

Professional Conduct, McCarty's speech is not protected. As in *Garcetti*, McCarty's speech was clearly related to his official duties as associate general counsel in that all of the information he disclosed was obtained solely through his position and not protected by the First Amendment.

Moreover, McCarty was not just a government employee – he was a lawyer. The protections afforded by the First Amendment, including freedom of speech, are not absolute. *Virginia v. Black*, 538 U.S. 343, 358 (2003). Like every citizen and government employee, McCarty enjoys the protection of the First Amendment, but he abdicated some of those rights when he took the oath to become a lawyer in this state.[8]

When attorneys gain admission to the bar and enter into professional relationships with clients, they voluntarily agree to restrain their speech about certain issues. McCarty swore an oath on September 15, 2010, and became licensed to practice law in this state. Pursuant to Rule 8.15(b), McCarty swore:

> I do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of Missouri;
>
> That I will maintain the respect due courts of justice, judicial officers and members of my profession and will at all times conduct myself with dignity becoming of an officer of the court in which I appear;
>
> That I will never seek to mislead the judge or jury by any artifice or false statement of fact or law;

---

[8] *See Confidentiality Obligations for Lawyer Blogging and Other Public Commentary*, ABA Formal Op. 18-480 ("Although the First Amendment to the United States Constitution guarantees individuals' right to free speech, this right is not without bounds. Lawyers' professional conduct may be constitutionally constrained by various professional regulatory standards as embodied in the Model Rules, or similar state analogs.").

*That I will at all times conduct myself in accordance with the Rules of Professional Conduct*; and,

That I will practice law to the best of my knowledge and ability and with consideration for the defenseless and oppressed.

So help me God.

(Emphasis added).

When he took this oath, McCarty swore he would conduct himself in accordance with the Rules of Professional Conduct – including Rules 4-1.6, 4-1.9(c)(1), and 4-1.9(c)(2), which prohibit disclosure of "information relating to the representation of the client." Any rights McCarty had to engage in political speech as a citizen or a government employee were limited on that fateful day in accordance with the Rules of Professional Conduct. McCarty, therefore, cannot ignore his oath and claim his First Amendment rights protect him from the Rules of Professional Conduct.

Missouri's public-employee whistleblowing statute, section 105.055, also does not shield McCarty from discipline.[9] Section 105.055.2 protects public employees who discuss the operations of a public employer "with any member of the legislature, state auditor, attorney general, a prosecuting or circuit attorney, a law enforcement agency, news media, the public, or any state official or body charged with investigating any alleged misconduct . . . ." Section 105.055.3(1)(a) prohibits a public employee's supervisor from taking "any disciplinary action whatsoever against a public employee . . . for the disclosure of information which the employee reasonably believes evidences . . . [a] violation of any

---

[9] References to section 105.055 are to RSMo Supp. 2022.

19

law, rule, or regulation." While these statutes may prohibit KCPD or McCarty's supervisor at KCPD from taking any disciplinary or adverse employment action against McCarty for his disclosures, the act does not limit this Court from taking disciplinary action against McCarty for violating the Rules of Professional Conduct or restrict this Court from sanctioning lawyers for violating their ethical duties to their clients.

McCarty swore an oath to conduct himself in accordance with the Rules of Professional Conduct. He breached this oath. He is subject to the appropriate discipline, and neither the First Amendment nor Missouri's whistleblower protections shield him from this Court taking such action.

**Appropriate Discipline**

Having determined McCarty violated the Rules of Professional Conduct as discussed above, this Court must determine the appropriate discipline. "The principal aim in disciplinary proceedings is not punishment. Instead, discipline is intended to protect the public and preserve the integrity of the legal profession." *In re Neill*, 681 S.W.3d 194, 198 (Mo. banc 2024) (internal quotations omitted). This Court "considers the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1992) (the 'ABA Standards') when determining discipline." *Id.* When determining the appropriate form of discipline under Rule 5.17(a), this Court generally considers (1) the duty violated; (2) the attorney's mental state; (3) the potential or actual injury caused by the attorney's misconduct; and (4) the existence of aggravating or mitigating factors. *Id.*; *see also* ABA Standard 3.0.

Section 4.0 of the ABA Standards addresses violations of duties owed to clients. "[T]he most important ethical duties are those obligations which a lawyer owes to clients."

20

ABA Standards, *Theoretical Framework*. Pursuant to the ABA Standards, the presumptive discipline in this case is suspension. ABA Standard 4.22 provides: "Suspension is generally appropriate when a lawyer knowingly reveals information relating to the representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client." By comparison, disbarment is generally appropriate when a lawyer knowingly reveals such information "with the intent to benefit the lawyer or another." ABA Standard 4.21. A reprimand, which McCarty argues his discipline should not exceed, is generally appropriate when a lawyer "negligently" reveals such information. ABA Standard 4.23. While McCarty may have disclosed confidential client information with good intentions, he undoubtedly did so knowingly rather than negligently, and there is no persuasive evidence he made the disclosures with the intent to benefit himself or another. Accordingly, suspension is the presumptive discipline.

Against the baseline sanction of suspension, this Court next considers mitigating and aggravating factors before determining the appropriate discipline. *See In re Belz*, 258 S.W.3d 38, 42-44 (Mo. banc 2008). OCDC's and McCarty's analysis with respect to these factors differ vastly, particularly regarding the aggravating factor of dishonest motive. *See* ABA Standard 9.22(b). Their differences lie in the characterization of McCarty's disclosures to the DOJ and to the public. Whereas McCarty views his disclosures as a selfless act made to protect the public from KCPD's misconduct, OCDC characterizes the disclosures as a dishonest and selfish act motivated by McCarty's contempt for his supervisor. This Court need not resolve this dispute to arrive at the appropriate discipline.

21

Three aggravating factors are clearly present in this case. First, McCarty's multiple disclosures evidence a pattern of misconduct under ABA Standard 9.22(c). He disclosed confidential client information in his December 7, 2022, e-mail to the DOJ investigators, and again in his December 10, 2022, e-mail to 143 separate e-mail addresses. Second, McCarty has refused to acknowledge the wrongful nature of his conduct under ABA Standard 9.22(g). Even if McCarty believed the disclosures were necessary for the public good, he has failed to acknowledge his acts violated the Rules of Professional Conduct by which he swore to abide despite conceding his disclosures and attached documents included client-related information. Third, McCarty was licensed to practice law in 2010; therefore, he has substantial legal experience pursuant to ABA Standard 9.22(i).

Several mitigating factors are also present. McCarty has no prior disciplinary record, and he cooperated with OCDC throughout the disciplinary process, including by voluntarily providing information to OCDC at the start of its investigation. ABA Standards 9.32(a), (e). McCarty also introduced significant evidence of his good character and reputation under ABA Standard 9.32(g). Four character witnesses testified about his positive character and reputation, and all four stated he was ethical and thoughtful. On McCarty's behalf, 32 individuals submitted character letters emphasizing his honesty, intelligence, thoughtfulness, and willingness to help those in need.[10]

---

[10] McCarty also cites legal precedent suggesting no discipline or a mere reprimand is the appropriate sanction in his case. This Court is not persuaded that any of the cases or case law McCarty cited should guide its disciplinary determination in this case. This Court is guided by the ABA Standards, the mitigating and aggravating factors, and the gravity of the misconduct that tends to shed light on McCarty's fitness as an attorney "to protect the

22

Whether the disclosures were the acts of a disgruntled, recently terminated employee or of a dutiful public servant, McCarty knowingly disclosed client information in violation of his sworn duty of confidentiality. No matter how noteworthy his disclosure may have been, it does not justify violating his sacred duty to his client. If a client cannot trust its lawyer to keep in confidence the information it has shared, then the legal representation is irreparably compromised. This is especially true in representation of public entities. If a public entity cannot seek advice from its lawyer without risking dissemination of shared information to the public and beyond, then the public entity will no longer possess the trust and confidence to seek its lawyer's advice at all. Such an outcome is directly contrary to what this Court wants public entities, including KCPD, to do. The public benefits from public entities seeking advice and counsel from trusted attorneys. To ignore McCarty's serious breach of client confidentiality would irreparably damage the legal profession, public entities, and the public's trust in both.

## Conclusion

After considering all the facts, this Court finds McCarty violated Rules 4-1.9(c)(1) and 4-1.9(c)(2) of the Rules of Professional Conduct. His disclosures of confidential client information were not required or warranted under the rules, and his disclosures were not protected by the First Amendment or Missouri's public-employee whistleblowing statute. Considering McCarty's violations and all aggravating and mitigating factors, McCarty is

---

public and maintain the integrity of the legal profession." *In re Eisenstein*, 485 S.W.3d 759, 763 (Mo. banc 2016) (internal quotations omitted).

suspended indefinitely from the practice of law with no leave to apply for reinstatement for one year to protect the public and the integrity of the legal profession.

_____
W. Brent Powell, Chief Justice

All concur.